May it please the Court, Your Honor, I'm Philip Gillette, and I represent the appellate Troy Cooper. Your Honor, Nelson Mandela wrote in his book, A Long Walk to Freedom, it is said that no one truly knows the nation until one has been inside its jails. A nation should not be judged by how it treats its highest citizens, but its lowest citizens. The facts of this case arise from a what we would commonly call a prisoner lawsuit against the state. There's millions of those a year. They're very expensive for the state system. But this is a somewhat 1% case. And I say that because the information I read said about 1% of the cases end up at trial. And this is not a case where a prisoner is suing because he had a broken cookie, he received a magazine that he couldn't receive a magazine he liked, or he was suing the state for future lost wages while serving life without parole. This is a case where a plaintiff who has been incarcerated for more than 50 years and has never sued the state was transferred to a medical, a California medical facility which is operated by the California Department of Corrections and Rehabilitation. And the reason he was, was that in about 2005, he was not able to walk 150 yards because of issues with veins in his legs. So he was transferred to this facility. I believe it was in April of 2005. And the original diagnosis was clauditation, which is, you know, a vein problem. And ultimately after he went to this facility and saw medical care, they diagnosed him with peripheral vascular disease. He underwent extensive surgery. And I believe there were four surgeries. And during this time he was prescribed Coumadin, which I'm informed is a blood thinner. And he was not able, at various times he's alleged that he ran out of a prescription. I don't really understand how that happens or why that would happen, but that was what he alleged. On or about December 4th, he ran out of his prescription again. And December 8th, he presented to the medical facility for testing. And he was complaining of right leg pain. Mr. Cooper again was looked at and they didn't really do any testing. And on Christmas Eve, he was, he had an appointment with Dr. Chen, who's the defendant in this case. Mr. Cooper alleged in his complaint that he informed Dr. Chen of his pain. And the question is, the medical records state that there was no leg pain noted by Dr. Chen and that, you know, there was tendinitis that was the thing that he alleges was the leg pain. Mr. Cooper says that that was never the case. Ultimately, he didn't receive any medical care or any testing related to some clots or some kind of vein problems. And ultimately on December 29th, he was again seen by a different doctor who immediately noticed his leg was cold. He called an ambulance. When they were told that the transport was going to get two days, I believe he was actually helicoptered to the facility, which ultimately, this led to Mr. Cooper having his leg amputated, his right leg amputated below the knee. So as a result of that, Mr. Cooper filed a lawsuit against the state of California. And he was alleging under Section 18, I'm sorry, under 1983, a deliberate indifference to medical needs. As part of this, Mr. Cooper had attempted to find counsel. And as you would suspect, that when a lawyer receives a letter from someone who's incarcerated, it's not the kind of client that most lawyers would jump at taking for sure. So there's, so we start off right off the bat that the incarcerated defendant has a difficulty finding counsel to represent him. So he ends up representing himself. He files multiple motions to the court to appoint counsel. I believe there were three of those different motions. The court, in denying those motions, cited to the relevant authority. However, the court basically bootstrapped the idea that you're a prisoner and every three hours a week in the law library is not a reason for me to appoint counsel for you. If counsel had been appointed, what would have happened with respect to Mr. Cooper's ability to put on his own expert? That is to say, would the appointments of counsel carried with it an ability to hire an expert on his side? Well, whether he could independently hire an expert, I haven't found any authority  to order someone to pay for that. But he could file a motion for the court to appoint a neutral expert, at least, so there's some person that, other than the treating doctor, as a witness, who's going to be able to say, yes, you're supposed to or not. And if counsel had been appointed by the court, who would have paid for counsel? Well, if the court would have appointed a neutral, my understanding is that the government No, I'm not talking about counsel, not expert. If counsel had been appointed, who would have paid for counsel? Well, it could have been one of two things. It could have been that counsel would have been on a contingent basis, or it could have been that counsel would have done it on a pro bono basis. And the court has panels of attorneys Contingent basis, where's the authority for that? How does that work? I'm not familiar with hiring a court reaching out to counsel and saying, take this case on a contingent basis. Well, I don't know that that's necessarily listed in the code, but, you know, the point of it is that the court could have certainly appointed counsel. There's a list of pro bono counsel that the district courts have available to them. Pro bono would have been. Certainly. But you're talking about counsel, and I know you were asked to, but you didn't appeal on that basis that he was denied counsel. Well, Your Honor, we appealed on the basis that, which is our third issue, which is that the pro se prisoner defendant wasn't given notice of the requirement of expert witnesses. But you didn't appeal on the basis that he was denied counsel. Specifically outlined that we did not. That's true. So the idea on appointment of counsel, we realize that appointment of counsel is a privilege and not a right, and it should only be allowed in exceptional circumstances. The problem is that this Court's order didn't address those exceptional circumstances. And there's – well, I couldn't find any Ninth Circuit authority that addressed the exceptional circumstances and allowed appointment. I did find a case, which was the Palmer v. Valdez case, which addressed the issues that the court should. So the court should address what problems the pro se prisoner defendant has, how their particular issues affect their case, whether they're organized, whether they're able to represent themselves. And the motions that Mr. Cooper filed showed that he was procedurally defective. He wasn't really filing evidence in support of those. These motions were very skeletal. They might have served as an outline for a good motion and responses to summary judgment and other things, but they were not detailed enough where Mr. Cooper was able to prevail. Well, the only two witnesses at trial were Cooper and the doctor, Kaur, right? That's correct. And he could have – Chen.  Chen. Was it Chen or Kaur? It's Chen. Okay, Chen. Anyway, but there – had there been counsel, I could see this case being developed in a much more thorough way. I mean, it's – but the odd thing about it, to me, the oddest thing is the medical malpractice is almost res loquitur. I mean, it's just so obvious that it wasn't tendonitis and he should have been treated for what it was. I don't even know how he ended up with a jury verdict that went the other way. I wasn't the trial attorney, Your Honor, so I don't know the answer to that. I know. Cooper was. Right. Right. Exactly. Exactly. So that only supports the argument that he wasn't competent to try his own case. Now, are you appointed counsel now? I am. By us? Yes. Pro bono? Yes. Okay. Okay. So did the court want me to address the other three issues that were alleged in the opening brief? Because I want to reserve five minutes for my co-counsel. Well, I think – yeah. No, I don't need you to address the rest. Okay. I don't know about the others. Okay. And my co-counsel is very prepared on those issues as well. Okay. If the court thinks of anything in the meantime. All right. Thank you. Thank you. Any additional points that was asked of the court? Yes. Come on up. You have five minutes. Mario Valenzuela. On page 15 of our opening brief, we did refer to prisoner rights, advocacy groups, lawyers, medical professionals. We feel that that encompasses 28 U.S.C. 1915. But, I mean, do you represent – I mean, it's easy, pretty straightforward. I mean, you knew there were four motions for summary – I mean, motions for appointment counsel, and that could have been placed directly as a issue in the brief, and it wasn't. Correct? I respectfully disagree, Your Honor. I believe the language of the opening brief included lawyers, experts. Well, the language in the brief argues about the insufficiency of the Rand and Wyatt notice. It talks about the life sentence reference, and then it makes a general catch-all sort of that there should be more notice on certain provisions, experts. But one issue could have been the failure to appoint counsel, and that was not set forth in one of the issues, was it? It was not set as clearly as we wish we would have had it in light of the Court's ruling, but we believe we broadly placed that language there because the purpose of the Rand-Wyatt warnings was to get him to have the ability to get the counsel or get somebody to help him, and that might be a counsel appointing – I mean, filing a motion for an expert. 1915d allows for witness fees, and it doesn't limit it to witnesses. It could be experts, we believe. So I believe there was room there. So what are we supposed to do with a case where we appoint counsel, where it jumps out at you from the pleadings and what happened in the district court that there's an appealable issue with respect to whether or not the district judge appropriately denied appointment of counsel at the trial court level? The appeal is not brought on that basis. When we appoint counsel, we don't list all the arguments why we appoint counsel. But what happens if the basic reason we're appointing counsel is to raise that? It doesn't happen. Are we allowed to ask for supplemental briefing in which the point for which we actually appointed counsel is now raised on appeal? To answer that question, I would suggest to the Court that under the Wyatt non – I mean, the notice that wasn't given under Wyatt is sufficient to reverse. Should the courts find that that is insufficient to reverse, then we would like to supplement. Yeah. Well, I must say I'm somewhat handicapped on the question as to whether or not the district court erred, if it did, in refusing to appoint counsel because it's not been briefed. Okay. Thank you, Your Honor. Good morning. May it please the Court, John Allen, Attorney General's Office for the Defendants. Appellant is represented by counsel in this appeal, and this issue challenging Appointed by us, right? Correct. Yeah. And chose not to challenge the denial of counsel in the district court, and that issue, therefore, is waived. Would it be improper or beyond our authority to ask for supplemental briefing from the lawyer that we appointed to raise an issue that seems not to have been raised? Well, when the issue is waived, I think it would be inappropriate, unless there was some showing, which there has not been, either a showing or even argument that there was any manifest injustice in not briefing this in the first place. Well, they did. They did broadly argue, especially with respect to the continuance issue, that, you know, he wasn't allowed the time to go consult with prison advocacy attorneys or, you know, find expert witnesses or, I mean, it just does seem that it was very he was very handicapped in the pursuit of this case. And they do argue that he, the whole trial was unfairly, he wasn't given the, it was unfairly conducted, he wasn't given the, his pleadings weren't given, the liberal reading of pleadings should be given for a pro se person. I mean, I don't understand why they didn't specifically raise the four denials of his request for counsel in this appeal. But there definitely seems to have been some injustice maybe manifest here. Well, there was not manifest injustice in this case. And I can just, you raised a number of issues, so I'm trying to decide what to address first here. Okay, well, I know this question, so there was counsel representing the warden and the State, right? The medical personnel who were sued, yes. There was a doctor, a nurse, and a pharmacist. And who was the counsel for them? I was counsel. You were counsel at trial. And another deputy earlier in the case. I was at trial. You conducted the trial against Mr. Cooper? Yes. And I would state. Well, you seem highly confident to me, so it seems, it just seems unfair, you know, to have him have to go up against you. Well, that's not the standard that this Court has announced. And so. Did you oppose the motion for appointment of counsel? No. So you didn't, the judge didn't even make you respond? No. No, the Court did not ask the defendants to respond. And I can just share with the Court that my view is that's something between the Court and the. So you take no position as to whether or not counsel should be appointed for Mr. Cooper? Correct. Is that correct? Okay. Yes. But I certainly take a position here today, and that is that the Court did not abuse its discretion by denying counsel. And I just want to address something that. Why not, though? Before you address it, why not? Why didn't the Court abuse its discretion by denying counsel? Well, because the plaintiff appellant did not present either of the factors, support either of the factors for appointment of counsel, which requires extraordinary circumstances and specifically a likelihood of success on the merits and an inability to articulate his claims in light of the complexity of the legal issues. And just looking at the first factor, he did not even argue or lend support to the position that there was a likelihood of success on the merits. The closest he came to that in his motion was to observe that, well, as a pro se plaintiff, his pleading had been screened at the beginning of the case and was found to state a cognizable claim and was not frivolous. Well, that is neither here nor there. That just means he has a case. It doesn't mean that he has any likelihood of success on the merits. And so not having raised that or argued it, supported it with facts, that's enough by itself to show that the Court was within its discretion to deny the motion just on that basis alone. So how much evidence, if evidence is even the right word, did the district court have in front of it at the time that this motion was made or the various times the motions were made in terms of likelihood of success? I mean, did Mr. Cooper have in front of the district court the story that he sought to tell or not? Yes. Absolutely. Well, so why is that not showing actually a fairly high likelihood of success? You've got some guy who has a clear problem. Dr. Chen seems incapable of even asking him to take off his shoes and socks so he can feel his foot. As soon as the doctor does it, he does a medivac. I mean, why is that not itself enough to show some likelihood of success? Well, that's precisely why there was never any likelihood of success, because of how tenuous this claim ever was. That doesn't sound like a tenuous claim to me at all. It sounds as though Dr. Chen was incompetent. No. Well, first of all, Dr. Chen was not incompetent. And the evidence before the Court and in the record is overwhelming that he provided attentive and the evidence in front of the Court that's medical evidence is Dr. Chen's testimony. I read Dr. Chen's testimony. I'm not sure. But all the medical records were in as well. The medical records were admitted as well. Right. And it showed clearly that he was diagnosed. He didn't do a thorough examination. He diagnosed him with tendinitis when he had a medical history of having this other thing, which causes blood clots, apparently, and which ultimately led to his leg being amputated. I don't understand why that's not very, very, very strong evidence of malpractice by Dr. Chen. Mr. Cooper did have tendinitis. He was diagnosed with tendinitis. He was treated for tendinitis. A patient can have tendinitis and peripheral vascular disease. Well, how do you know he had tendinitis? Because Dr. Chen said so? Yes. Dr. Chen was the doctor. Dr. Chen might have made a mistake. Dr. Chen missed something. Well, okay. And he may have, the argument may be, you know what, Dr. Chen missed the diagnosis. So you can't say he had tendinitis. That's the question. Well, the record supports that he had tendinitis. But the record you're pointing to is Dr. Chen's diagnosis? Dr. Chen testified. Have you ever had tendinitis? I believe I have, yes. Okay. So you know what it is. You know how it builds, right? Yes. I just got over tendinitis. Got it from hiking 19 miles. So I know what tendinitis is. Yes. And it's nothing at all related to peripheral artery disease. Right. Nothing. And you do definitely different types of tests for it, right? Correct. And if Cooper had had a real lawyer and an expert witness, he could have come in and said, these two things have nothing to do with each other. You might have them both at the same time, but you do different medical tests for the two different diseases or conditions. I think tendinitis is a condition. My law clerks are laughing out there because they've had to suffer with me with my tendinitis from foolhardy hiking. Anyway, but they're completely different, completely different tests. I was never in dispute. I hope we're not arguing about whether tendinitis is different from peripheral or vascular disease. The point is you're telling us the tendinitis when he may have, but he also had this very serious disease that caused his leg to be amputated. Yes. And Dr. Chen was giving him attentive, proper, closely examined care for that condition before, during, and after the visit in question with the tendinitis. And that's why he had to have his leg amputated because of that care. Leg amputated. Is that the question? The reason his leg was amputated is because he had a chronic progressive condition that eventually resulted in a severe ischemic event that after multiple surgeries over a long course of time, eventually they could not save his leg. How many surgeries did they have on him? He, in April 2008, he had surgeries to restore circulation. Then in November 2008, if I'm correct with the dates, it's off the top of my head, but he had an angioplasty to restore circulation, which was partially effective. And then eventually in January, he had another procedure, and that eventually failed, and then that's when he lost his leg. Was he also diabetic? I don't remember off the top of my head. Because I think you have a really good defense, like you make a really good argument about no level of medical attention could possibly have saved his leg. But I just think that there's probably an expert out there that would say, yeah, his leg could have been saved if he had not been just, if he had been treated properly at that last moment. Mr. Cooper, even without counsel, was free to call other experts. He had, I believe, seven vascular surgeons. Don't quote me on the number, but it was definitely more than one. It was more than a few. They were listed in pretrial report. He was instructed by the judge, he was given in part of the scheduling order for the trial, instructions on how to call a witness to trial, either through subpoena or voluntarily. There's no record evidence that Mr. Cooper ever attempted to do that. And so he had expert evidence available to him, and we can infer the fact that he did not call that is because it would not have supported him. And there's every reason to think that it would not. If this were a competent lawyer, I think that would be a legitimate inference. I'm not sure here with a pro se person with a 10th grade education that that's a legitimate inference. Well, again, that's not the test, though, because even Wilborn. Well, but you say we can infer. I'm not sure we can infer. That may not be the test, but I'm responding only to your statement. We can infer that they would have given him adverse testimony from the fact that he didn't call them. That's true if it's a lawyer, but I'm not sure at all sure that it's true here. Well, it's certainly one reasonable inference, perhaps among others. But it is an inference that could be made. And there are two pieces to this test. And you recited the first one, which is to say likelihood of success. And the other one is a complicated legal issue. Right. Now, I'm not sure the legal issue here is actually all that complicated if all we're doing is stating the legal standard. The legal standard is was there deliberate indifference. But does complicated legal issue also mean complicated factual issue leading to the legal determination? It could. I think they're intertwined. However, I would point out that this, in this particular case, deliberate indifference, this was not a complicated legal issue at all. And that's illustrated by, well, first of all, framed by Mr. Cooper's own claim, which is that Dr. Chan did no examination at all. I went in with complaints of pain, history of claudication. I had the history of peripheral vascular disease and prior surgeries. And he did nothing. He didn't expose my leg. He didn't look at it. He did no examination at all on multiple occasions. That is not a complicated legal issue. That either was what happened or it didn't. And that would stand or fall on Mr. Cooper's credibility. And no lawyer would have had any effect on whether Mr. Cooper was credible when he came in and said that or not. And no expert would have, because no expert would have been present at that event either. They would have only been able to comment on, well, what was the history of this disease, how did it progress, and what care was provided. And I want to emphasize again that the evidence is not, we're not going to, we should not assume that Dr. Cooper, Mr. Cooper's version of events is what should have been accepted. There was never, that was enough certainly to get past summary judgment. That was, you know, he said, he said, there's a difference of opinion. But there was never any reason to believe him. He was, there was no credibility. All the evidence was overwhelming and replete in the record that he was not an accurate historian of any of his medical trials. Kennedy. Kagan.      Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan.         Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. When he saw that he did not have therapeutic levels of blood thinning medications, specifically for his peripheral vascular disease, he took that from another doctor so that he personally could handle Mr. Cooper's care. He ordered, he... When did this happen? This was before this was in, I want to say, April. It was definitely between April and September. And he started ordering regular lab tests to check the blood thinning medication. And he classified Mr. Cooper as a high-risk patient so that he could get regular scheduled visits. He conducted those scheduled visits in September 22, October, late October, late November, late December. All those were scheduled by Dr. Chen for no other reason. So Dr. Chen has been his treating physician here for some time before he shows up in December with the leg pain. Yes, and specifically for peripheral vascular disease. That's why the evidence was never going to support a likelihood of success on the merits, because it made no sense. It not only made no sense. Why would Dr. Chen pick up his file? I'm going to take care of you. I'm going to take care of your peripheral vascular disease. I'm going to order labs. I'm going to check them. I'm going to adjust your medication. I'm going to have regular visits. I'm going to classify you as a high-risk patient. And then he comes in and he doesn't do anything. That doesn't make sense. And in addition to that, it was contradicted by all of the medical records. The medical records showed that, A, Mr. Cooper forgot about entire medical visits with Dr. Chen. I mean, from that alone, the strong inference, almost necessary inference, is we can't count on Dr. and Mr. Cooper to tell us what happened at these visits. We've got to have to look and see whether it's corroborated. And it wasn't. It was contradicted. And just, I see my time's running out. If I could just take a moment to run through how articulate he was in advancing his claims, the most important thing, which is sort of at the end of this list, is Mr. Cooper's closing argument at trial. He's there. He's by himself. He's presenting his case to the jury. And he very articulately expressed all of the elements of the claim, all of the facts that he felt supported them, his theory of why that constituted inadequate care, how it caused his problems. And then he went through the governing law. I don't think anyone could read that closing argument and say that this is an extraordinary circumstance where a pro se inmate was not able to articulate his claim. Didn't you oppose his medical records coming in? No. At one point, didn't you? The Court's asking you why shouldn't they be in, why shouldn't the medical records be in? Yes. The district court was concerned about why should these records not come in. They're the Department's own records. They're obviously authentic and genuine. And my response to that was, yes, they're authentic, they're genuine. That should not be a basis to keep them out. But who was going to, who explained what the medical records meant? Well, Dr. Cooper was certainly there testifying. Dr. I mean, Dr. Chen. I'm sorry. Dr. Chen was certainly there testifying. And my only objection to any particular record was did it actually come up in testimony? If it didn't come up, well, then it's not particularly relevant to anything and it could be confusing to the jury. But the records themselves did come in. The Court even moved in additional records on its own motion, and that was fine. Everything that I believe that Mr. Cooper asked to come in came in. Do you have any more information on how counsel is appointed when a judge does find extraordinary circumstance and likelihood of success and ability to handle the issues? What's the procedure in your eastern district? Yes. Of California? Do you know what the procedure is or the circumstances surrounding that? I can state from our defense perspective, where we don't really know what goes on, but we'll receive an order stating that the Court has elected to appoint counsel. And at some point we'll get something that says who it was and whether they accepted it. But is it a pro bono system? Well, it's ostensibly pro bono. However, if the counsel prevails, they can seek their attorney's fees. So as an old plaintiff's counsel, I would not call that pro bono. But it is pro bono if there's they do not prevail. It's pro bono if they lose. That's right. But that's the same as contingency. So I wouldn't call that pro bono either. Well, actually, it's better contingency because you just get your full fees if you win, period. You don't have to worry about percentage of recovery. You just get your hourly rate. And your expenses are paid for. And if that could appear in the Court's opinion, that would be nice. I didn't get a chance to go through it. My time is up. Or do I have two minutes left? No. Your time is up. Okay. Was there a point, Bill, you didn't have a chance to make? Well, I wanted to just emphasize throughout, from the beginning to the end of this proceedings in the district court, how effective he was and just all the various things that Mr. Cooper was able to do on his own behalf and how effectively he was. I agree that he did. Just getting this to a trial was pretty impressive. But that's because the case was so strong. I mean, it is impressive that he got it to trial. Do I have time to address that? The last point, if I could, and that is, even if there were error, which has not been shown, we still have a harmless error analysis, and that was never addressed as well. And the question is, what would counsel do if they had been appointed before in the district court? And if this were remanded, what would counsel do? And it's going to be the same case. Either they're going to believe Mr. Cooper as to what Dr. Chen just did nothing, despite all the medical records, despite his credible testimony, despite all the evidence, or they won't. But a lawyer is not going to add to that and an expert is not going to add to that. All right. Thank you, counsel. He went over. I'll give you one minute to address the harmless error issue, which he raised on rebuttal for the first time. Your Honor, I think in harmless error. Oh, you have time saved. I'm sorry. That's what Judge Fletcher was pointing out. In regards to the harmless error, I think the question is, what could have been done differently? Well, there could have been an expert, a medical expert that would have questioned the records, would have established a standard of quick care, determined whether the proper diagnosis was made. All these events or all these factors were not made because Mr. Cooper was not capable of making them. He was never going to win the way it's set up now. The doctor, even though he testified as a layperson, he's essentially his own expert. He spoke in medical terms. He knew what he was talking about. Mr. Cooper, yes, he knows his personal medical records, but that's far from determining whether that's the standard of care, whether the diagnosis is correct, whether he got the right treatment, whether not getting his prescription filled for eight days made a difference. It didn't make a difference. It made a difference that he lost his leg. That's all, Your Honor. Thank you. Thank you, counsel. All right. Cooper v. Chen is submitted, and we will take up Witherow v. Skolnick.
judges: Wardlaw, W. Fletcher, Murguia